IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs May 20, 2025

## STATE OF TENNESSEE v. CORRIDIRUS QUALLS A/K/A "SHOOTA"

**Appeal from the Circuit Court for Lauderdale County**
**No. 11274    A. Blake Neill, Judge**

_____

**No. W2024-00469-CCA-R3-CD**

_____

Defendant, Corridirus Qualls, was convicted of one count of first degree premeditated murder; two counts of attempted second degree murder; one count of reckless endangerment by discharging a firearm into an occupied habitation; two counts of employing a firearm during the commission of a dangerous felony; two counts of aggravated assault; and one count of reckless endangerment. The trial court sentenced Defendant to a total effective sentence of life plus eighteen years. On appeal, Defendant argues that (1) the evidence was insufficient to support his convictions and (2) the trial court abused its discretion by imposing partial consecutive sentencing. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and MATTHEW J. WILSON, JJ., joined.

Bryan R. Huffman and Jere Mason, Covington, Tennessee, for the appellant, Corridirus Qualls.

Jonathan Skrmetti, Attorney General and Reporter; Jeri K. Neff, Assistant Attorney General; Mark E. Davidson, District Attorney General; and Julie K. Pillow and Harrison Hight, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

Defendant was indicted[1] by a Lauderdale County Grand Jury for one count of first degree premeditated murder (Count 1); two counts of attempted first degree murder (Counts 2 and 3); one count of reckless endangerment by discharging a firearm into an occupied habitation (Count 4); two counts of employing a firearm during the commission of a dangerous felony (Counts 5 and 6); six counts of aggravated assault (Counts 9-10, 12-15); one count of evading arrest endangering others (Count 11); and one count of vandalism in an amount of $2,500 or more but less than $10,000 (Count 16). Counts 11, 13, 14, and 15 were dismissed. The following facts were adduced at trial.

On the morning of September 7, 2021, Lantonio Grandberry picked up Chrishun Taylor[2] in Ripley, Tennessee, in his mother's red Dodge Charger. The two men drove to the Rolling Hills apartment complex in Ripley, where Chrishun Taylor contacted Defendant. Five minutes later, Defendant arrived at the complex in a red Chevrolet Cavalier. Chrishun Taylor got out of the Charger and spoke with Defendant before both men got back into the Charger. Chrishun Taylor sat in the front passenger seat, and Defendant sat in the back passenger-side seat. When Defendant entered the Charger, Mr. Grandberry noticed that he was wearing "a little mask [around his neck]." The men rode around for some time before picking up Joshua Taylor at Defendant's request, and Joshua Taylor brought with him a 9mm Ruger firearm and sat in the back driver-side seat. Joshua Taylor noticed that Defendant was carrying a .40 caliber Glock in his waistband with a "D'usse sticker." Defendant then requested Mr. Grandberry drive toward Henning because "people may be out," and Mr. Grandberry complied. This was the only time Defendant was ever in the Charger.

Defendant directed Mr. Grandberry to Sedric Rogers's home on West McFarlin Avenue in Henning, Tennessee. After the Charger drove by the home, Defendant noticed Mr. Rogers and stated, "There go Tojo . . . I should hit him up." Burnett Yarbrough, Mr. Rogers's cousin, later identified "Tojo" as Mr. Rogers. Defendant ordered Mr. Grandberry to drive by the home and then turn around. When they were again in front of the home, Defendant asked Mr. Grandberry to stop with the driver's side of the Charger facing the home. After the Charger stopped, Mr. Grandberry heard gunshots. He looked outside the car window and saw a "big person fall." Mr. Grandberry turned around to look into the backseat and noticed Defendant had pulled the mask up and reached over Joshua Taylor "from the window with a gun in his hand." He described the gun as a Glock with "little crosses on it, like a sticker." Joshua Taylor saw "a girl and a man [and possibly] a few more people" on the porch "scrambling around" after Defendant shot his gun. The man

[1] Defendant, Latonio Lamar Grandberry aka "KC Gutta", Chrishun Taylor aka "Shunshun", and Joshua Taylor aka "Valley", were indicted in a multi-count indictment. Defendant was not named in Counts 7 and 8 of the indictment. Defendant was not tried with his codefendants.

[2] Because two witnesses have the same last name, we will refer to Chrishun Taylor and Joshua Taylor by their full names to avoid confusion.

was "heavy set" and "sitting down." When the shots were fired, the man placed his arms up "like he was trying to shield himself" before he fell forward onto the porch. Defendant "pulled back in[to]" the Charger and asked why the others were not firing. Joshua Taylor fired his 9mm Ruger "two or three" times, and Mr. Grandberry "hit the gas." Mr. Grandberry heard the second round of shots and testified that they sounded like a smaller caliber than the first round of shots, indicating that two guns were fired. Defendant then ordered Mr. Grandberry to drive to Halls, Tennessee.

Earlier that morning and prior to the shooting, Mr. Yarbrough drove to Mr. Rogers's home in Henning. Laquita Davis, Mr. Rogers's cousin, arrived at the home around five minutes later. While the three conversed on the porch, Mr. Rogers sat on top of a television. Mr. Yarbrough noticed a red Charger with dark-tinted windows stop at a stop sign before making a right turn toward Mr. Rogers's home. Mr. Yarbrough testified that "the sun was hitting through the back windshield, [and he saw] four bodies in the car." Ms. Davis explained that the car came "from behind the house . . . at a high speed making a lot of noise." Because of the way the sun was shining through the windows of the car, Ms. Davis could also see "a silhouette of four guys" in the Charger. Ms. Davis turned back around before feeling Mr. Rogers "push[] her arm, and he told [her and Mr. Yarbrough] to get down." She looked toward the street and "saw the red Dodge Charger had come back[.]" She saw a gun pointed from back seat window, and she and Mr. Yarbrough heard numerous gun shots. Mr. Rogers fell face first on the porch, and Ms. Davis explained that Mr. Rogers "appeared to be expired already." After ensuring that the Charger had driven off, Ms. Davis called law enforcement. She provided a description of the Charger and stated there were four men in the car. On cross-examination, Mr. Yarbrough denied telling investigators that three men were in the Charger, explaining, "[Detective Micah Middlebrook] said there were three people in the car. I told the investigator it was four people in the car."

Erica Washington lived in Henning near Mr. Rogers's home. Shortly before the shooting, she sat outside her home with her friends when a "red car kept driving up and down the road." When the car drove by the final time, Ms. Washington heard gunshots, and she attempted to get everyone inside her home. The car "started racing back down the hill" before turning around in the street. When the car passed by her house again, Ms. Washington saw the back passenger-side window roll down, and a person in the car pointed a gun at Ms. Washington. The person did not fire any shots.

Detective Middlebrook, a detective for the Lauderdale County Sheriff's Department ("LCSD"), responded to the scene of the shooting. He found Mr. Rogers on the porch lying on his back with gunshot wounds to the head and leg. Emergency medical services were on the scene and confirmed that Mr. Rogers was deceased. Detective Middlebrook noticed that the body had been rolled over from a face-down position, as evidenced by the blood

pattern. There were bullet holes in the siding of the home above and beside a television sitting on the porch. At least one bullet ricocheted off the porch ceiling and into the home. Detective Middlebrook recovered a bullet jacket in front of the porch steps, two bullets from the porch, and two bullet casings from the road that were submitted to the Tennessee Bureau of Investigation ("TBI") for testing. Before leaving the scene, Detective Middlebrook also spoke with Lawanda Rogers, Mr. Rogers's wife. Detective Middlebrook testified that Ms. Rogers was in the master bedroom of Mr. Rogers's home at the time of the shooting.

Detective Middlebrook also interviewed Ms. Davis and Mr. Yarbrough. Detective Middlebrook testified that the bullet holes lined up with where Ms. Davis stated that Mr. Rogers was sitting at the time of the shooting. Detective Middlebrook admitted that he may have asked Mr. Yarbrough whether there were three people in the Charger. He explained that he assumed there were at least three people in the Charger because Ms. Davis told him that the back window was rolled down.

After the shooting, Mr. Grandberry drove the Charger to the Cherry Dale apartment complex in Halls, where Defendant noticed a "big black truck" pull into the parking lot. Justin Tate, the Chief of Police for Halls Police Department ("HPD"), was driving the truck. Earlier that day, Chief Tate received a call from dispatch informing him to be on the lookout for a red Dodge Charger with a black spoiler and dark-tinted windows. At approximately 1:30 p.m., Chief Tate was parked behind a convenience store in Halls when he spotted a Charger matching the description. He followed the Charger to the Cherry Dale apartment complex and pulled in "two or three parking spaces down from them." Chief Tate advised all units to be en route to his location. When Defendant noticed the truck, he instructed Mr. Grandberry to leave the complex, and Mr. Grandberry complied.

After leaving the apartment complex, the Charger was able to temporarily avoid the truck but was shortly thereafter pulled over by a police cruiser on Front Street in Halls. Chief Tate arrived at the stop on Front Street and pulled in front of the Charger to block its escape. Defendant instructed Mr. Grandberry to wait until the officers walked toward the Charger before attempting an escape. Once the officers exited their vehicles and approached the Charger, Mr. Grandberry drove around the truck and fled. A police pursuit ensued but the officers lost sight of the Charger.

Defendant directed Mr. Grandberry to stop the Charger near a wooded area so that he could exit the car, and Defendant asked Joshua Taylor and Chrishun Taylor to leave with him. Chrishun Taylor fled into the woods with Defendant. Joshua Taylor moved to the front passenger seat, and Mr. Grandberry noticed a "black small gun" in his waistband. Mr. Grandberry proceeded to search for law enforcement to surrender and was intercepted by a police cruiser driven by HPD Officer Harry Hopkins on Espey Park Road in Halls.

- 4 -

Officer Hopkins observed the Charger approach his cruiser, so he turned on his emergency lights and stepped out with his rifle before hearing the Charger accelerating toward him. Officer Hopkins testified, "Everything was tunnel vision. It was all in on the car. When I heard the vehicle coming toward me, I opened fire." Mr. Grandberry stopped the Charger, backed up, and turned around before fleeing again. Mr. Grandberry called a friend to pick up him and Joshua Taylor. Joshua Taylor testified that Mr. Grandberry drove the Charger to a house in "Stanton or Mason" and parked it there, before removing the license plate and placing it in the trunk. Both Mr. Grandberry and Joshua Taylor were picked up by the friend. Law enforcement later found and seized the Charger in Stanton, Tennessee.

TBI Special Agent Matt Harber was instructed to investigate an officer-involved shooting on Espey Park. After securing the scene on Espey Park, he went to the crime scene on West McFarlin and performed a canvas of the neighborhood. His investigation led him to suspect Defendant, so he and a few other agents went to Defendant's home. They asked Defendant to come to the LCSD to speak with them, and he complied. During the interview, Defendant denied having been in Henning or in any vehicle on September 7, 2021. He claimed he did not know Mr. Grandberry.

Defendant was placed in custody at the Lauderdale County jail after his interview. While Defendant was in custody, Special Agent Harber intercepted a phone call placed by Defendant in September of 2021. Defendant called his children's mother to ask whether the Cherry Dale apartment complex had cameras. The children's mother told Defendant that it did, and Defendant responded, "I know I didn't do it, because I would have wore [sic] a mask." Defendant placed another phone call from the jail to an unknown person, and Special Agent Harber testified that the unknown person asked Defendant, "where is that thing with the D'usse on there." Special Agent Harber testified, "[Defendant] said, 'I believe my cousin has it.' I think BJ is what [Defendant] said." Special Agent Harber spoke with Defendant's cousin, who revealed that he had received a call from the unknown person but denied being in possession of the gun. The cousin claimed that he saw Defendant with "either a 40 or 45 [with] a liquor bottle symbol on it." Special Agent Harber also obtained a search warrant for Defendant's cell phone and recovered a photograph of Defendant's gun displaying its serial number. Special Agent Harber contacted Glock Industries in Atlanta, Georgia, and provided the serial number. Glock Industries informed Special Agent Harber that the gun was a .40 caliber Glock 22.

Special Agent Harber also spoke with Mr. Grandberry after Mr. Grandberry's attorney reached out to the TBI. Special Agent Harber met with Mr. Grandberry at his attorney's office, and Mr. Grandberry provided a statement consistent with his trial testimony. As a result of Mr. Grandberry's interview, Special Agent Harber reached out to Joshua Taylor, and he also gave a statement consistent with his trial testimony. Joshua Taylor also informed Special Agent Harber that he disposed of his 9mm Ruger by throwing

it from the Charger's window. Joshua Taylor's father further provided Special Agent Harber with Joshua Taylor's cell phone number, and Special Agent Harber obtained and executed a search warrant for Joshua Taylor's cell phone records. Both Mr. Grandberry and Joshua Taylor were eventually arrested and indicted.

On cross-examination, Mr. Grandberry testified that he did not tell Special Agent Harber that the "big person" fell after the second round of shots. He reaffirmed that he heard "a couple more shots" fired by Joshua Taylor after pulling away from Mr. Rogers's home. Mr. Grandberry thought Defendant fired the first round of shots because he "heard a loud gun" fire before he looked into the back seat and saw Defendant "reaching back [with] a big gun in his hand." Mr. Grandberry also testified that he was originally facing a first degree murder charge with a possible life sentence prior to entering a plea agreement with the State. Under the agreement, Mr. Grandberry faced a maximum sentence of twelve years with house arrest, but the agreement was contingent on his testifying in this case. He testified that the plea agreement did not affect the truthfulness of his testimony.

Joshua Taylor denied disposing of his gun because he killed Mr. Rogers, asserting that Defendant killed him. On cross-examination, he testified that he fired his 9mm Ruger because "[he] panicked. They could have started shooting—[Defendant] shot out my window, somebody could have shot me." He also denied any involvement in an alleged rap video detailing the killing of a man named Tojo. Joshua Taylor admitted entering into a plea agreement regarding his conduct, but he claimed not to recall the sentence he was facing prior to the plea. When asked whether he knew he was facing life in prison prior to the plea agreement, Joshua Taylor stated, "I guess so." He denied that the plea agreement had any effect on his testimony.

Special Agent Harber was cross-examined regarding a photograph taken on September 5, 2021, and recovered from Facebook pursuant to a search warrant. The photograph depicted Defendant and Chrishun Taylor standing together with two unidentified individuals. In the picture, Chrishun Taylor was holding the gun with the "D'usse" symbol. Special Agent Harber testified, however, that Chrishun Taylor never claimed to have possessed the gun but that Defendant had. Special Agent Harber also admitted that despite having identified Defendant as a suspect, he never asked any of the witnesses at the scene of the incident whether they had seen Defendant fire the gun. He explained, "No witness that I spoke with advised me that they were able to actually see a face[,]" so he believed such questioning to be futile.

Special Agent Harber also detailed a video he recovered from Joshua Taylor's cell phone that depicted Joshua Taylor pointing a gun toward the camera and stating "DOA" and "no hospital." An unknown male in the background stated, "straight graveyard." The video was recorded three days after the shooting. Another video was recovered from

Chrishun Taylor's cell phone. It showed Chrishun Taylor and Joshua Taylor in the back seat of a vehicle. Joshua Taylor held up a pistol and said, "we are going to look for another." Chrishun Taylor held an assault rifle and said, "trying to up the score again." Joshua Taylor made a finger gun motion and imitated gunfire sounds. This video was recorded on December 10, 2021.

Special Agent Harber was further cross-examined about an interview conducted by TBI with Tenaka Tate on September 13, 2021. Ms. Tate saw the Charger on the day of the incident and identified Defendant as the driver of the Charger from a photographic array. Special Agent Harber testified that he was not present at the interview and that he questioned the reliability of the identification. He explained, "[The photographic array had] different backgrounds. Some appear to be mugshots. Some have different backgrounds such as just a normal wall. So it's in my opinion not the best photo array that was made available." He also emphasized that because he was not present during the identification, he could not be certain that it was conducted in a reliable manner. Special Agent Harber reiterated that the evidence he reviewed indicated that Defendant was sitting in the back passenger-side seat at the time of the shooting.

Scott Collier, a medical examiner for the West Tennessee Forensic Center, performed an autopsy on Mr. Rogers. The autopsy revealed that Mr. Rogers died from gunshot wounds to the head and left thigh. The shot to the head failed to exit Mr. Rogers's head, and a bullet and bullet fragments were recovered therefrom. The autopsy also revealed blunt force trauma to Mr. Rogers's forehead, upper lip, and nose that were consistent with him falling face-first onto the ground. The bullet and bullet fragments were submitted to the TBI for testing.

Derek Proctor, a firearm and toolmark analyst for the TBI, examined the bullet and bullet fragments recovered from Mr. Rogers's head, the two bullets recovered from the porch, the two casings recovered from the street in front of Mr. Rogers's home, and the bullet jacket recovered from in front of the porch steps. Mr. Proctor concluded that the two casings were fired from the same .40 caliber firearm and that the marks present on them were consistent with firearms manufactured by Glock. He further concluded that the bullet jacket was fired from a separate firearm that appeared to be a 9mm/.38 caliber firearm manufactured by Beretta, KelTec, Ruger, Walther, or a similar manufacturer. The two bullets recovered from the porch and the bullet recovered from Mr. Rogers's head were determined to be from a 10mm/.40 caliber firearm manufactured by Bersa, Glock, Heckler & Koch, or a similar manufacturer. Tests of the bullet fragments were inconclusive.

Hunter Green, a latent fingerprint examiner for the TBI, prepared a report examining latent prints that were recovered from the Charger by the TBI pursuant to a search warrant. Known fingerprint samples from Mr. Grandberry, Chrishun Taylor, and Defendant were

submitted to the TBI for comparison. Ms. Green's examination revealed the presence of one identifiable fingerprint and three identifiable palm prints. The fingerprint was lifted from the exterior of the back passenger-side window. The prints were submitted through the Automated Fingerprint Identification System ("AFIS") operated by the TBI. The AFIS search revealed that the fingerprint matched Defendant's fingerprint and that one of the palm prints matched the palm print of Mr. Grandberry. Ms. Green could not opine how long the print had been on the window.

Law enforcement recovered several videos from the Rolling Hills apartment complex that were admitted into evidence. The videos depicted a red Charger pulling into the complex at approximately 12:15 p.m. on September 7, 2021. Chrishun Taylor exited the Charger from the front passenger door. Around five minutes later, a red Cavalier pulled into the same complex, and Defendant exited from the driver's door of the Cavalier. Defendant appeared to then walk around the Charger and inspect it. Special Agent Harber testified that the video also depicted what he believed to be a firearm in Defendant's waistband bearing the D'usse symbol. Defendant appeared to be wearing a "neck gator . . . that you would lift up over and cover your face." Defendant eventually entered the Charger through the back passenger-side door and appeared to touch the exterior side of the door's window. Chrishun Taylor reentered the Charger through the front passenger door before the Charger departed from the complex at approximately 12:24 p.m. At approximately 11:09 p.m. the same day, Defendant and Chrishun Taylor returned to Rolling Hills in a white car driven by an unknown person. Defendant and Chrishun Taylor exited the white car and got into Defendant's red Cavalier before leaving the complex. Additional videos recorded on the day of the incident and recovered from Mr. Rogers's neighborhood depicted a red Charger drive through the neighborhood toward Mr. Rogers's home at approximately 12:40 p.m. and away therefrom five minutes later. These videos were also admitted into evidence.

Carla Rexing, a Special Agent with the Federal Bureau of Investigation's Memphis Division assigned to the Cellular Analysis Survey Team, prepared a report analyzing the call detail records collected from Defendant's and Joshua Taylor's cell phone records dated September 7, 2021. Special Agent Rexing testified that the records indicated Defendant was at the Rolling Hills apartment complex at 12:18 p.m., where he called Joshua Taylor; Defendant and Joshua Taylor were in the same vehicle near Mr. Rogers's home at the time of the shooting; Defendant was near Espey Road in Halls while escaping on foot from law enforcement from 2:57 p.m. to 6:52 p.m.; Joshua Taylor was in or around Stanton from 2:44 p.m. to 3:05 p.m.; Defendant was in Halls and making two calls to Joshua Taylor at 8:18 p.m. and 8:31 p.m.; and Defendant was at or near the Rolling Hills apartment complex at 11:10 p.m. She also testified that the records were consistent with video footage that law enforcement obtained during their investigation. However, Special Agent Rexing

admitted that the records could not indicate whether Defendant had his cell phone at these times.

The State rested and Defendant moved for a judgment of acquittal. The trial court denied the motion.

Defendant did not testify at trial. Defendant recalled Special Agent Harber and questioned him regarding the identity of Defendant as the shooter and the agent's investigation of Chrishun Taylor.

The jury found Defendant guilty of one count of first degree premeditated murder in Count 1; two counts of attempted second degree murder in Counts 2 and 3; one count of reckless endangerment by discharging a firearm into an occupied habitation in Count 4; two counts of employing a firearm during the commission of a dangerous felony in Counts 5 and 6; two counts of aggravated assault in Counts 9 and 10; and one count of reckless endangerment in Count 12. The jury acquitted Defendant of vandalism valued between $2,500 and $10.000 in Count 16.

The trial court imposed a life sentence for Count 1; twelve years at thirty percent each for Counts 2 and 3; six years at thirty percent for Count 4; six years at one-hundred percent each for Counts 5 and 6; six years at thirty percent each for Counts 9 and 10; and eleven months and twenty-nine days at seventy-five percent for Count 12. The trial court merged Counts 9 and 10 with Counts 2 and 3. The trial court ordered Counts 2 and 3 to be served consecutively to Count 1 but concurrently to each other. It further ordered Count 5 to be served consecutively to Count 2 and that Count 6 be served consecutively to Count 3. The trial court ordered the remaining counts to be served concurrently with Count 1, for a total effective sentence of life plus eighteen years.

Defendant filed a renewed motion for judgment of acquittal or, in the alternative, a new trial, wherein he argued that there was insufficient evidence to sustain his convictions and that the trial court erred by ordering partial consecutive sentencing. The trial court denied Defendant's motion, and Defendant timely appealed.

*Analysis*

*Sufficiency of the Evidence*

Defendant argues that there was insufficient evidence for a jury to conclude that (1) Defendant had the requisite mens rea for any of his convictions and (2) Defendant was the shooter. The State argues that the evidence was sufficient on both grounds. We agree with the State.

When examining whether the evidence presented at trial was sufficient to support a conviction, several well-settled principles guide our analysis. We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The defendant bears the burden on appeal to demonstrate that the evidence is insufficient to support his conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

"[A] jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The State is entitled on appeal to "the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Questions as to the credibility of witnesses and the weight of the evidence, as well as factual issues raised by such evidence, are resolved by the trier of fact, not this Court. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). These principles guide us "'whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

A defendant's mental state, or mens rea, is a material element of an offense "unless the definition of an offense plainly dispenses with a mental element." T.C.A. § 39-11-301(b). "A person commits an offense who acts intentionally, knowingly, recklessly or with criminal negligence, as the definition of the offense requires, with respect to each element of the offense." *Id.* § 39-11-301(a)(1). A person's mental state "may be inferred from both direct and circumstantial evidence." *State v. Washington*, 658 S.W.2d 144, 146 (Tenn. Crim. App. 1983).

Defendant was convicted of the first degree murder of Mr. Rogers in Count 1; the attempted second degree murders of Ms. Davis and Mr. Yarbrough in Counts 2 and 3; reckless endangerment by discharging a firearm into an occupied habitation in Count 4; employing a firearm during the attempted second degree murders of Ms. Davis and Mr. Yarbrough in Counts 5 and 6; the aggravated assaults of Ms. Davis and Mr. Yarbrough in Counts 9 and 10; and the reckless endangerment of Ms. Washington in Count 12.

Defendant argues that the evidence was insufficient for a jury to conclude that he had the requisite mens rea for any of his convictions. Specifically, he asserts, because "[he] denies committing the offenses, it therefore follows that he did not have the requisite intent to commit any of the offenses." Defendant appears to rely solely on his proclaimed innocence during his allocution at the sentencing hearing. However, the State correctly points out the evidence relevant to a sufficiency challenge on appeal is limited to the evidence presented to the jury. *See State v. Alley*, 968 S.W.2d 314, 316 (Tenn. Crim. App. 1997) ("[The *Jackson*] standard contemplates consideration of all of the evidence submitted *at trial*. . . ." (emphasis added)). Nevertheless, we will consider each of Defendant's convictions in turn, reviewing the trial evidence in the light most favorable to the State.

First degree murder is the premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1). A person "acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* § 39-11-302(a). A premeditated act is one "done after the exercise of reflection and judgment." *Id.* § 39-13-202(e). Premeditation requires a finding that "the intent to kill must have been formed prior to the act itself." *Id.* "It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id.* Premeditation is a question of fact for the jury's determination. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Courts frequently look to the circumstances surrounding a killing to discern the presence of evidence sufficient to support a finding of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815 (Tenn. Crim. App. 2013).

Factors tending to support the existence of premeditation include: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; and preparations before the killing for concealment of the crime, and calmness immediately after the killing." *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). The factors listed in *Bland* are not exhaustive, however. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). The nature of the killing or evidence establishing a motive for the killing may also support a conclusion that the crime was premeditated. *Id.* Lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *Larkin*, 443 S.W.3d at 815-16 (citing *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000)).

In the light most favorable to the State, the evidence at trial showed that Defendant directed Mr. Grandberry to drive the Charger to Mr. Rogers's home in Henning. Defendant brought a mask and a .40 caliber Glock with him. When Defendant noticed Mr. Rogers standing on the porch, Defendant pointed him out by nickname, stating, "There go Tojo . . . . . I should hit him up[.]" Defendant directed Mr. Grandberry to stop the Charger in front

- 11 -

of Mr. Roger's home, and Defendant put on the mask. He then fired multiple shots in Mr. Roger's direction, killing him. There was no evidence that Mr. Rogers was armed or provoked Defendant, and Defendant did not attempt to render Mr. Rogers aid. A reasonable jury could conclude that Defendant had the conscious objective or desire to kill Mr. Rogers and that such intent was formed prior to the murder. *See* T.C.A. §§ 39-11-302(a) and -13-202(a)(1), (e). Defendant is not entitled to relief from his first degree premeditated murder conviction.

Second degree murder is the "knowing killing of another." *Id.* § 39-13-210(a)(1). "A person acts knowingly with respect to the result of the person's conduct when he is aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b). Criminal attempt is committed when a person, acting with the kind of culpability otherwise required for the offense,

> (1) intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be; (2) acts with intent to cause a result that is an element of the offense and believes the conduct will cause the result without further conduct; or (3) acts with intent to complete a course of action or cause a result that would constitute the offense under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

*Id.* § 39-12-101(a). To prove that a defendant committed attempted second degree murder, the State must prove "that the defendant acted with the intent to cause the knowing killing of another, believing his conduct would cause the result without further conduct on his part." *State v.* Inlow, 52 S.W.3d 101, 104 (Tenn. Crim. App. 2000).

A person also commits an offense by "posess[ing] a firearm . . . with the intent to go armed during the commission of or attempt to commit a dangerous felony." T.C.A. § 39-17-1324(a). A person "acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* § 39-11-302(a). "Dangerous felony" is defined to include "[a]ttempt to commit second degree murder[.]" *Id.* § 39-17-1324(i)(1)(B).

In the light most favorable to the State, the evidence at trial showed that Defendant fired multiple shots from his .40 caliber Glock in the direction of Ms. Davis, Mr. Yarbrough, and Mr. Rogers while the three conversed on Mr. Rogers's porch. When Defendant began shooting at the victims, Mr. Rogers instructed Ms. Davis and Mr. Yarbrough to "get down." Mr. Rogers grabbed Ms. Davis by the arm shortly before being fatally shot. Law enforcement recovered two bullets from the porch and one bullet from

- 12 -

Mr. Rogers's head. A reasonable jury could conclude that Defendant was aware that firing multiple shots in the immediate direction of Ms. Davis and Mr. Yarbrough was reasonably certain to kill them without further conduct on his part. *See Inlow*, 52 S.W.3d at 104; *see also* T.C.A. §§ 39-13-210(a) and -12-101(a). A reasonable jury could also conclude that Defendant had the conscious objective to go armed with his .40 caliber Glock during the attempted second degree murders of Ms. Davis and Mr. Yarbrough. *See* T.C.A. §§ 39-11-302(a) and -17-1324(a), (i)(1)(B). Defendant is not entitled to relief from his attempted second degree murder and employing a firearm during the commission of a dangerous felony convictions.

Finally, a person commits reckless endangerment when he or she "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." *Id.* § 39-13-103(a). A person acts "recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 39-11-302(c). Such conduct must also "constitute[] a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." *Id.* Reckless endangerment, as charged in Count 4, is enhanced where the reckless conduct was the "discharging of a firearm . . . into a[n occupied] habitation." *Id.* § 39-13-103(b)(3).

In the light most favorable to the State, the evidence at trial indicated that Defendant fired multiple shots at Mr. Rogers's home from the window of a red Charger and that Ms. Rogers was in the master bedroom of the home at the time of the shooting. At least one of the bullets entered the home's interior. Shortly after the shooting, Ms. Washington saw the red Charger drive by her home and its back passenger-side window roll down, and a person in the Charger pointed a gun at her from the window. Defendant was sitting in the back passenger-side seat at the time of the incident. A reasonable jury could conclude that Defendant was aware of and consciously disregarded a substantial and unjustifiable risk that placed Ms. Rogers and Ms. Washington in danger of imminent death by firing into a home occupied by Ms. Rogers and pointing a gun directly at Ms. Washington. *See id.* §§ 39-11-302(c) and -13-103(a), (b)(3). Similarly, a reasonable jury could conclude that such conduct constituted a gross deviation from the standard of care that an ordinary person would exercise under Defendant's perceived circumstances. *Id.* Defendant is not entitled to relief on his reckless endangerment convictions.

Defendant also asserts that the evidence at trial was insufficient to prove beyond a reasonable doubt that he was the shooter. He argues that the Charger made at least one stop before arriving at Mr. Rogers's home and that the cell phone records merely demonstrated that Defendant's phone was at the scene of the incident but could not indicate the location of Defendant's person. He also argues that Mr. Grandberry's and Mr. Joshua

- 13 -

Taylor's testimonies at trial were similarly insufficient to establish that he was the shooter. We disagree.

Identity is an essential element of any crime. *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015). Identity may be established with circumstantial evidence alone. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). "[T]he evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt." *Bell*, 512 S.W.3d at 198 (citing *Dorantes*, 331 S.W.3d at 380-81). The jury determines the weight to be given, and inferences to be drawn from, circumstantial evidence. *State v. Gibson*, 506 S.W.3d 450, 458 (Tenn. 2016) (citing *Dorantes*, 331 S.W.3d 379). In resolving questions of fact, such as the identity of the perpetrator, "'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013) (quoting *State v. Hornsby*, 858 S.W.2d 892, 897 (Tenn. 1993)).

Under Tennessee law as it stood when the trial in this case commenced,[3] when the conviction is "'solely based upon the uncorroborated testimony of one or more accomplices,'" the evidence is insufficient to sustain a conviction as a matter of law. *State v. Thomas*, 687 S.W.3d 223, 239 (Tenn. 2024) (quoting *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013)). The Tennessee Supreme Court has defined "'accomplice' to mean 'one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime.'" *Id.* (quoting *Collier*, 411 S.W.3d at 894). Further, "accomplices cannot corroborate each other." *State v. Boxley*, 76 S.W.3d 381, 386 (Tenn. 2001) (citing *State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995)). "The test for whether a witness qualifies as an accomplice is whether the alleged accomplice could be indicted for the same offense charged against the defendant." *Jones*, 568 S.W.3d at 133 (internal quotation marks omitted) (quoting *Collier*, 411 S.W.3d at 894).

Separately, the Tennessee Supreme Court has explained the nature of required corroboration evidence:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also

---

[3] On March 7, 2024, the Tennessee Supreme Court abolished the accomplice-corroboration rule. *Thomas*, 687 S.W.3d at 242-43. However, the court chose to do so prospectively in the interest of fairness and due process. *Id.* at 245. The court specifically declined to apply its ruling to the defendant's case and to "other pending cases that have not yet reached final judgment." *Id.* Accordingly, we apply the common law accomplice-corroboration rule as it stood before the Tennessee Supreme Court's opinion in *Thomas*.

include some fact establishing the defendant's identity.  This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.  It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (alteration in original) (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994), *superseded by statute on other grounds*, T.C.A. § 39-13-204(i)(2), *as recognized in State v. Odom*, 137 S.W.3d 572, 580-81 (Tenn. 2004)).

Joshua Taylor testified at trial that Defendant reached across him and fired at Mr. Rogers, Mr. Yarbrough, and Ms. Davis from the back driver-side window of the red Charger and that Defendant killed Mr. Rogers.  The jury was presented with additional evidence corroborating Joshua Taylor's testimony.  This evidence included the testimonies of Ms. Davis and Mr. Yarbrough identifying the Charger and the window from which the gun was fired; video evidence showing Defendant wearing a "neck gator" and carrying a .40 caliber Glock while entering the Charger on the day of the incident; tests performed by the TBI on the bullets recovered from Mr. Rogers's head indicating they were .40 caliber bullets with marks consistent with being fired from a Glock; and call detail records placing Defendant's phone near Mr. Rogers's home at the time of the shooting.  We conclude that this evidence is sufficient to establish Defendant's identity as the shooter.  Accordingly, Defendant is not entitled to relief on this basis.

## Consecutive Sentencing

Defendant also argues that the trial court abused its discretion by imposing partial consecutive sentencing.  The State argues that Defendant waived review of this issue by insufficient briefing, or, in the alternative, the trial court did not abuse its discretion.  We agree with the State that Defendant waived review of the issue due to insufficient briefing.

An appellant's brief must contain "[a]n argument . . . setting forth: (A) the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on."  Tenn. R. App. P. 27(a)(7).  This Court's rules similarly state that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."  Tenn. Ct. Crim. App. R. 10(b).

While Defendant provides citations to relevant authority and some citations to the record, his entire substantive argument in support of the issue as outlined in his brief is as follows: "[Defendant] advances although the trial court set forth reasons for consecutive sentencing, the trial court abused its discretion. Consecutive sentences are not warranted in this case, and this Court must remand this case for sentencing accordingly." We decline to "construct developed arguments from [Defendant's] conclusory statements" and search the record for information necessary to resolve them. *State v. Cunningham*, No. M2023-00909-CCA-R3-CD, 2024 WL 3634259, at \*2 (Tenn. Crim. App. Aug. 2, 2024), *no perm app. filed*. This issue is waived, and Defendant is not entitled to relief.

## CONCLUSION

Based upon the foregoing, we affirm the judgments of the trial court.

s/Timothy L. Easter
TIMOTHY L. EASTER, JUDGE

- 16 -